747 N.W.2d 1 (2008)
275 Neb. 334
LAW OFFICES OF RONALD J. PALAGI, P.C., L.L.O., Appellee and Cross-Appellant
v.
Steven H. HOWARD, Appellant and Cross-Appellee.
Rosa Jurado, Special Administrator of the Estate of Salvador,
Jurado-Melendez, deceased, and Law Offices of Ronald J. Palagi, P.C., L.L.O., Appellees, and
Steven H. Howard, Appellant,
v.
Agri Co-op, a Nebraska corporation, and Union Insurance Company, Appellees.
Nos. S-06-384, S-06-664, S-07-757.
Supreme Court of Nebraska.
April 4, 2008.
*4 Michael F. Coyle, David J. Stubstad, and Sherman P. Willis, of Fraser Stryker, P.C., L.L.O., Omaha, for appellant.
Joseph B. Muller, of Law Offices of Ronald J. Palagi, P.C., L.L.O., Omaha, for appellee Law Offices of Ronald J. Palagi.
Thomas F. Hoarty, Jr., Omaha, for appellee Law Offices of Ronald J. Palagi in Nos. S-06-384, S-06-664.
Jeffrey Jacobsen, Kearney, for appellee Law Offices of Ronald J. Palagi in No. S-07-757.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
STEPHAN, J.
These consolidated appeals relate to a dispute between The Law Offices of Ronald J. Palagi, P.C., L.L.O. (Law Offices), and attorney Steven H. Howard, a former *5 employee of the firm. The dispute involves entitlement to attorney fees in two cases which were pending at the time Howard left his employment with Law Offices in 2003. The fee in one of those cases, No. S-07-757, is the subject of all three consolidated appeals.

I. FACTS
Ronald J. Palagi was admitted to practice law in Nebraska in 1975. After practicing with an Omaha firm for a short period, Palagi started Law Offices in Omaha. Howard was admitted to practice law in Nebraska in 1987. In September 1991, he began working at Law Offices as an independent contractor.
In 1993, Howard and Law Offices entered into an "Attorney's Agreement" which "establish[ed] the terms and conditions of their business relationship." Under this agreement, Howard was designated as an employee of Law Offices. Law Offices agreed to pay Howard 15 percent of "any attorney fees received from client files which [Howard] is assigned and which he will resolve." The Attorney's Agreement further provided at paragraph 4:
The parties agree that [Howard] is offered an amount equal to an additional 5% of any total attorney fees received from the client files assigned and resolved by him for the month. The parties agree that this additional 5% is not consideration for past work, but rather is consideration for any future legal work as set forth in Paragraph 11.
Paragraphs 11 and 12 then provided:
The parties acknowledge that the clients listed on the client list may exercise their right to choose [Howard] as their attorney in the event [Howard's] association with The Firm is terminated.
... If clients of [Law Offices] request that [Howard] represent them, then [Howard] may decide to represent them, but all attorney fees generated on such matters would be paid to [Law Offices], and no attorney fees will be paid to [Howard]. [Howard] acknowledges that the consideration for this commitment is the consideration set forth above, including the additional 5% payment....
The Attorney's Agreement also set forth terms and conditions that would be followed in the event the parties' association terminated, including that Howard was to give 30 days' written notice, that Howard was not to contact any client of Law Offices prior to giving his notice, and that Howard was not to remove any client documents or papers from Law Offices.
The parties acknowledge that in 1997, they orally agreed to a change in the manner in which Howard was to be compensated, but they dispute the terms of the change. According to Palagi, the sole shareholder of Law Offices, Howard told him in the summer of 1997 that he was having financial difficulties and wanted a fixed salary instead of the percentage payments. Palagi stated that in July 1997, they agreed that Howard would receive a salary of $7,000 per month. According to Palagi, the parties agreed that this amount would be divided into two paychecks, one for $4,500 payable on the first of the month and the second for $2,500 payable in the middle of the month. According to Palagi, this pay structure was intended to reflect the provisions regarding "future consideration" contained in paragraphs 4, 11, and 12 of the 1993 Attorney's Agreement. Palagi also indicated the possibility that Howard would be paid discretionary bonuses.
Howard's version of the 1997 agreement is substantially different. He testified that in the summer of 1997, Palagi told him that his current caseload, consisting primarily of workers' compensation and accident *6 cases, would be assigned to another lawyer and that Howard would begin working with Palagi on more substantial cases and would eventually "try some very significant cases." According to Howard, 100 to 120 cases were then transferred from him to another lawyer, and Howard was not paid for any of the work he had done on those cases. Howard testified that Palagi did not specifically mention the Attorney's Agreement, but did tell him that they were "starting over." Howard viewed the change as a favorable professional opportunity. Howard agreed to the $7,000 monthly salary and understood that Palagi would also pay him bonuses based on performance. Howard testified that he chose to split the $7,000 into the two monthly payments because it fit with his bill schedule.
In December 1998, Rosa Jurado, special administrator of the estate of her late husband, Salvador Jurado-Melendez, retained Law Offices to represent her. Jurado-Melendez had been killed in a grain elevator accident which occurred in Buffalo County, Nebraska, in 1997. In 1999, Law Offices filed a wrongful death action on Jurado's behalf in the district court for Buffalo County, naming Agri Co-op, the owner of the grain elevator, and Union Insurance Company, its workers' compensation carrier, as defendants. Howard prepared the case for trial with the assistance of Palagi and other Law Offices personnel. Law Offices advanced almost $122,000 in litigation expenses.
Between 1997 and 2002, Law Offices paid Howard the agreed-upon salary of $7,000 per month in two monthly payments, and also paid him periodic bonuses. In the summer of 2002, just prior to the scheduled trial of the Jurado case, Howard and Palagi again discussed Howard's compensation. Palagi testified that he offered Howard up to 25 percent of any fee recovered in the Jurado case if Howard would pay, prior to trial, a corresponding percentage of the litigation expenses which had been advanced by Law Offices. Palagi testified that Howard declined this offer.
Howard's account of this conversation is different. He testified that during the first 6 months of 2002, he had generated substantial fees for Law Offices but was still receiving only his $7,000 monthly salary. In July 2002, just before leaving on a planned vacation, he told Palagi that he was frustrated and was thinking of leaving the firm. Howard testified that Palagi immediately wrote him a check for $25,000 and told him to go on vacation and that they would talk more when he returned. Howard testified that they met again when he returned from vacation and at that time, Palagi offered Howard 50 percent of any fee recovered in the Jurado case if Howard paid 50 percent of the costs Law Offices had advanced. Alternatively, Palagi offered 25 percent of the fee recovered in the Jurado case and two other cases the firm was litigating, referred to in the record as the "Barker" and "Christiansen" cases. Howard testified that he accepted this latter offer and agreed to stay at the firm.
Howard tried the Jurado case in the district court for Buffalo County, with the assistance of a paralegal employed by Law Offices. Palagi did not participate in the trial. On September 16, 2002, the jury returned a verdict in the amount of $2,125,000 in favor of Jurado. Agri Co-op appealed and filed a supersedeas bond.
In November 2002, while the Jurado appeal was pending, Law Offices paid Howard a bonus. Palagi testified that the bonus was for the work Howard had done during the year. He denied having any agreement with Howard regarding the fees in the Barker or Christiansen cases at the time of this payment. Howard testified *7 that the bonus he received in November 2002 included 25 percent of the fee in the Barker case, which had been settled during the preceding month. He testified that in December 2002, when Law Offices received the fee in the Christiansen case, he approached Palagi about payment of his 25-percent share, but Palagi responded that Howard had already received a "nice check" in November and did not pay him any additional bonus. This upset Howard.
In late December 2002, Howard visited Jurado at her home in Holdredge, Nebraska. He spoke with her about a settlement offer of $500,000 received during the pendency of the appeal and recommended that she reject it. Near the end of the conversation, Howard mentioned that he was thinking of leaving Law Offices, and Jurado asked him to let her know if he decided to do so.
On February 9, 2003, Howard returned to Jurado's home and informed her that he would probably be leaving Law Offices, but that he would continue to represent her if she wanted him to do so. He informed her that she had the right to choose her lawyer and that she could choose him but was not required to do so. He answered questions asked by Jurado and a family member who was present. Before leaving, Howard gave Jurado a proposed retention agreement, a sample letter to Law Offices terminating its representation, and a blank copy of her fee agreement with Law Offices. After consulting with another attorney, Jurado retained Howard to continue representing her and terminated her relationship with Law Offices by letter dated February 19, 2003. Jurado testified that Howard had been her main contact throughout the course of the litigation and that it was her idea for Howard to continue to represent her. She specifically testified that she would have wanted Howard to remain as her attorney no matter what actions Law Offices took to try to retain her as a client.
A settlement was reached in the Jurado case, and the appeal, Jurado v. Agri Co-op,[1] was dismissed by the Nebraska Court of Appeals on June 4, 2004. Pursuant to the settlement agreement, Agri Coop paid a total of $1,950,000, which was deposited in estate proceedings initiated by Jurado in the county court for Phelps County. As a result of the settlement, Howard filed a satisfaction of judgment on behalf of Jurado.

1. BUFFALO COUNTY LITIGATION (CASE NO. S-07-757)
Both Law Offices and Howard filed notices of attorney lien in Jurado v. Agri Co-op and requested that the district court for Buffalo County resolve their competing claims. Howard, Law Offices, and Jurado stipulated that of the total settlement amount, $121,893.93 should be paid to Law Offices to reimburse it for the litigation expenses it had advanced. They further stipulated that $780,000 represented a fair and reasonable amount of the total attorney fee to be paid by Jurado. The parties stipulated that this amount should be held in a separate interest-bearing account by the clerk of the county court for Phelps County in the Jurado-Melendez estate proceeding, for the benefit of Law Offices and Howard only.
In its initial ruling on the competing attorney liens, the district court noted that there was pending litigation between Law Offices and Howard in Douglas County regarding their respective rights under an employment agreement and that both parties had agreed that resolution of the lien issue was not intended to resolve that dispute. As to the competing attorney liens, *8 the court determined that an offer to settle for $500,000 was pending at the time Jurado terminated her relationship with Law Offices and retained Howard. Reasoning that the contingent fee agreement between Law Offices and Jurado entitled Law Offices to one-third of any settlement agreement pending at the time of termination, the court awarded Law Offices $166,667 of the $780,000 and awarded Howard the remaining $613,333.
Law Offices appealed, and in a memorandum opinion filed June 21, 2006, we reversed, and remanded. Noting that the disputed funds were held by the probate court and were not "in the hands of the adverse party" within the meaning of the attorney lien statute,[2] we characterized the action as an equitable proceeding to determine the amount of fees to which Law Offices and Howard were entitled for services to the Jurado-Melendez estate, based upon the principle of quantum meruit. We also noted the "unique circumstances" presented by the parties' separate litigation of their contractual claims against each other and determined that for purposes of resolving the appeal, we would treat the case as if there had been no employment relationship between Palagi and Howard, i.e., "as if the Estate had simply discharged its attorney and retained a different attorney who had no prior relationship with previous counsel or the case." We concluded that the district court should have allocated the total amount of the fee to the parties based upon the reasonable value of their services before and after Jurado discharged Law Offices and retained Howard. We therefore reversed the judgment of the district court and remanded the cause "for an allocation of attorney fees based on a determination of the reasonable value of the services performed by [Law Offices] up to February 19, 2003, and Howard thereafter."
Following our remand, the district court conducted an evidentiary hearing and determined that Law Offices was entitled to $746,250 plus interest and that Howard was entitled to $33,750 plus interest. In an order entered on April 13, 2007, which included these findings, the court directed "the Clerk of the District Court for Buffalo County" to forward the sum of $746,250 plus 95.68 percent of accrued interest to Law Offices arid to forward the sum of $33,750 plus 4.32 percent of accrued interest to Howard. On its own motion, the court entered an amended order on April 19 in which it directed that the same payments be made by "the Clerk of the County Court for Phelps County, Nebraska." On April 25, Howard filed a motion to alter or amend the judgment, which the court denied. Howard then filed the appeal docketed as case No. S-07-757, which we moved to our docket on our own motion.

2. DOUGLAS COUNTY LITIGATION (CASES Nos. S-06-384 and S-06-664)
Law Offices filed an action against Howard in the district court for Douglas County, alleging a breach of the 1993 Attorney's Agreement and tortious interference with a business relationship. In its operative seventh amended complaint, Law Offices alleged that certain oral modifications of the Attorney's Agreement occurred in 1997. Based on an alleged breach of the Attorney's Agreement as modified and other theories of recovery, Law Offices sought the full $780,000 fee in the Jurado case, as well as other relief. In his answer, Howard denied liability and alleged counterclaims in which he sought 25 percent of the fees in Jurado and Christiansen cases received by Law Offices, and additional relief pursuant to the Nebraska *9 Wage Payment and Collection Act (NWPCA).[3] In a pretrial ruling, the district court determined that the Attorney's Agreement was an enforceable contract.
The case was tried to a jury, which returned a verdict awarding Law Offices $585,000 of the $780,000 fee in the Jurado case and awarding Howard the remaining $195,000. The jury also awarded Howard $16,625, an amount equal to 25 percent of the fee in the Christiansen case. Both parties filed motions for new trial, and Howard filed a motion to alter or amend the judgment. Howard also filed a motion for costs and attorney fees pursuant to the NWPCA. The district court denied both parties' motions for new trial and Howard's motion to alter or amend the judgment. The court sustained Howard's NWPCA motion for costs and attorney fees on his claim for a portion of the fee in the Christiansen case, awarding him $4,156.25 in attorney fees plus taxable costs, but it denied his NWPCA motion as to the fee in the Jurado case, reasoning that because Law Offices had never been in possession of the fee, it could not have withheld payment from Howard. Howard perfected an appeal, and Law Offices cross-appealed. We moved the case to our docket on our own motion, and it is now before us as case No. S-06-664.
Before the trial of the case resulting in No. S-06-664, Law Offices filed a second action in the district court for Douglas County against Howard, alleging a breach of the Attorney's Agreement. Howard filed a motion to dismiss, alleging that the complaint "sought to enforce provisions of the same" employment contract at issue in the pending case. The district court granted the motion to dismiss, reasoning that the previously filed and then pending action "involves the same parties and the same issues." Law Offices appealed from the order of dismissal, and on our own motion we moved the appeal to our docket, where it appears as case No. S-06-384.

II. CASE NO. S-07-757
After the appeal from the district court for Buffalo County was docketed, Law Offices filed a motion to dismiss for lack of jurisdiction, arguing that the appeal was not timely perfected. We overruled the motion and directed the parties to brief the jurisdictional issue, which they have done.

1. ASSIGNMENTS OF ERROR
Howard assigns, restated and consolidated, that the district court erred in (1) using different standards to divide the attorney fees, (2) admitting evidence allegedly showing Law Office's costs in litigating the Jurado case, and (3) relying on the inadmissible evidence in distributing the fees.

2. STANDARD OF REVIEW
Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.[4] Because the jurisdictional issue presented here does not involve a factual dispute, we resolve it as a matter of law.[5]

3. ANALYSIS
The jurisdictional issue turns on whether Howard's April 25, 2007, motion to alter or amend the judgment was timely *10 and therefore effective to terminate the time for appeal until it was ruled upon. "A motion to alter or amend a judgment shall be filed no later than ten days after the entry of the judgment."[6] When so filed, a motion to alter or amend the judgment terminates the "running of the time for filing a notice of appeal" until the entry of an order ruling on the motion.[7] Law Offices contends that because Howard's motion was not filed within 10 days of the district court's order of April 13, 2007, it did not terminate the 30-day time to appeal. It contends that the 30-day time to appeal thus expired before the notice of appeal was filed on July 11, 2007. Howard argues that because his motion to alter or amend the judgment was filed within 10 days of the district court's April 19 order modifying the April 13 order, it was timely and terminated the running of appeal time until the motion was overruled on June 13, 2007.
To resolve this issue, we must determine the nature and effect of the April 19, 2007, order which was entered on the court's own motion. In a similar context, we adopted the following rule:
If the amendment of a final judgment or decree for the purpose of correcting a "clerical error" either materially alters rights or obligations determined by the prior judgment or creates a right of appeal where one did not exist before, the time for appeal should be measured from the entry of the amended judgment. If, however, the amendment, has neither of these results, but instead makes changes in the prior judgment which have no adverse effect upon those rights or obligations or the parties' right to appeal, the entry of the amended judgment will not postpone the time within which an appeal must be taken from the original decree.[8]
We conclude that the same reasoning should apply to the filing of motions which terminate the running of time for appeal. Thus, if the April 19 order materially altered rights or obligations existing under the April 13 order, or created a right of appeal where one did not exist before, the filing of the motion to alter or amend on April 25 was timely. But if the April 19 order had no adverse effect on the rights or obligations of the parties under the April 13 order or the parties' right to appeal, the filing of the motion to alter or amend was not timely and did not terminate the running of the time for appeal.
The April 19, 2007, order amended the April 13 order in two respects. First, it deleted "Clerk of the District Court for Buffalo County" and substituted "Clerk of the County Court for Phelps County" as the person directed to disburse the designated portions of the $780,000 fee to Howard and Law Offices. Second, it added the name "Steven Howard" after the word "appellee" in the sentence directing disbursal of that portion of the fee which the court determined should be paid to Howard. Neither of these changes had any adverse effect on the rights or obligations of the parties under the April 13 order, nor did either change create a right to appeal where none had existed. The parties knew and indeed stipulated that the disputed fee was being held in the probate *11 proceedings pending in the county court for Phelps County. While the terms "appellant" and "appellee" were perhaps confusing in the context of the April 13 order, insertion of Howard's name after the word "appellee" resolved any possible confusion. The changes were clearly and simply an exercise of the district court's "`inherent authority to amend its records so as to make them conform to the facts.'"[9] Thus, the April 19 order did not affect the time in which to file a motion to alter and amend the April 13 judgment determining the portion of the disputed fee which each party was to receive. Because Howard's motion was untimely, it did not terminate the running of the time to appeal the April 13 order, and that time had expired before he filed his notice of appeal.
For these reasons, we conclude that we have no appellate jurisdiction, and we dismiss the appeal docketed as case No. S-07-757.

III. CASE NO. S-06-664
This appeal is from the first action filed by Law Offices against Howard in the district court for Douglas County, which was concluded by a jury trial and judgment entered on the verdict. The case once included multiple claims involving several clients represented by Law Offices and Howard prior to February 2003. By the time of trial in April 2006, the issues had been narrowed to two: (1) the competing claims of Law Offices and Howard to the $780,000 fee in the Jurado case and (2) Howard's claim to $16,625, which was 25 percent of the fee paid to Law Offices in the Christiansen case. The sum of the fees in dispute was $796,625, and the jury was instructed that it must award this amount "to either one party or, in some percentage totaling 100 percent, to both parties in this case." As noted, the jury awarded Law Offices $585,000 of the fee in the Jurado case. It awarded Howard the remaining $195,000 of the fee in the Jurado case and $16,625 of the fee in the Christiansen case.
We note that the fee in the Jurado case at issue in this case, No. S-06-664, is the same fee at issue in the Buffalo County case which resulted in case No. S-07-757, previously discussed herein. At the time of trial of this case, the fee was not in the possession of either party but was held in an interest-bearing account by the county court for Phelps County pursuant to the parties' stipulation. Having concluded that we lack jurisdiction to review the judgment of the Buffalo County action, we now address the issues presented by the appeal and cross-appeal in the Douglas County case.

1. ASSIGNMENTS OF ERROR
Howard assigns 18 errors., which form three basic issues: (1) whether the Attorney's Agreement was a valid, enforceable contract, and if so, whether there was trial error prejudicial to Howard; (2) whether Howard was entitled to recover costs and attorney fees under the NWPCA with respect to the fee in the Jurado case; and (3) whether the district court erred in denying Howard's motion for new trial.
Law Offices assigns on cross-appeal, restated and consolidated, that the district court erred in (1) allowing the jury to consider Howard's counterclaims for 25 percent of the fees in the Christiansen and Jurado cases and (2) directing a verdict for Howard on Law Offices' claim that he breached a fiduciary duty.

*12 2. STANDARD OF REVIEW
The determination of whether a contract violates public policy presents a question of law.[10] When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.[11]
A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[12]

3. ANALYSIS

(a) Enforceability of "Attorney's Agreement"
Law Offices' claim to the entire fee in the Jurado case is based upon the provision of the 1993 Attorney's Agreement which states that if Howard is retained by a Law Offices' client after he leaves the firm's employment, all fees generated by such representation are payable to Law Offices and no portion of such fees are payable to Howard. In a pretrial ruling, the district court determined that the agreement was an enforceable contract which had been breached by Howard, but that there was a genuine issue of material fact as to damages. In instructing the jury, the district court stated that Law Offices alleged that Howard had breached the contract by "claiming entitlement to legal fees in the Jurado[-Melendez] Estate case." Howard alleges on appeal that the Attorney's Agreement was not enforceable with respect to his representation of Jurado after leaving the employment of Law Offices because the agreement constituted a restrictive covenant which is overly broad and injurious to the public. Law Offices counters that the restriction in the Attorney's Agreement is reasonable and resulted from a conscious business decision by Howard to accept greater compensation during his employment in exchange for giving up any entitlement to a fee if he represented a client of the firm after leaving its employment.
As its title indicates, the contractual agreement at issue here is between attorneys who are subject to the professional ethics rules promulgated by this court. By establishing a "framework for the ethical practice of law," such rules establish a state's public policy with respect to the professional conduct of lawyers.[13] On the date of the agreement and during the parties' representation of Jurado, the Code of Professional Responsibility, Canon 2, provided in relevant part:
DR 2-108 Agreements Restricting the Practice of a Lawyer.
(A) A lawyer shall not be a party to or participate in a partnership or employment agreement with another lawyer that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement, except as a condition to payment of retirement benefits.
(B) In connection with the settlement of a controversy or suit, a lawyer shall *13 not enter into an agreement that restricts his or her right to practice law.
Since September 2005, Nebraska lawyers have been subject to the Nebraska Rules of Professional Conduct, which similarly provide:
Rule 5.6 RESTRICTIONS ON RIGHT TO PRACTICE
A lawyer shall not participate in offering or making:
(a) a partnership, shareholders, operating, employment or other similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or
(b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy.[14]
Based upon similar ethics rules in effect throughout the country, "[c]ourts do not enforce any agreement involving the employment of lawyers that appears to have restrictive and thus anticompetitive tendencies."[15] This is so whether the restriction on competition is direct or indirect.[16] The prohibition against restrictive covenants in agreements between lawyers is generally reasoned to be necessary to ensure the freedom of clients to select counsel of their choice.[17] Courts and commentators note a distinction between the business principles which govern commercial enterprises and the ethical principles that govern the practice of law and find that because "`"clients are not merchandise"'" and "`"[l]awyers are not tradesmen,"'" restrictive covenants may not "`"barter in clients."'"[18] Because the client's freedom of choice is the paramount interest the ethics rules attempt to serve, courts reason that any disincentive to competition is as detrimental to the public interest as an outright prohibition on competition.[19] Thus, cases almost uniformly hold that financial disincentive provisions in attorney agreements are unenforceable as against public policy.[20]
We agree with this reasoning and find it applicable to this case. While the restrictive language in paragraph 12 of the Attorney's Agreement does not directly restrict a departing lawyer from practicing in competition with the firm, it provides a strong financial disincentive for that lawyer to perform services for a former client, and accordingly, it restricts the client's right to retain the lawyer. We conclude that the restriction is contrary to public policy and unenforceable. Accordingly, we reverse and vacate the judgment in favor of Law Offices and against Howard,

(b) Counterclaims
In its cross-appeal, Law Offices contends that the district court erred in *14 submitting Howard's counterclaims to the jury, arguing that there was insufficient evidence to support Howard's claimed entitlement to 25 percent of the fees in the Jurado and Christiansen cases. When reviewing the sufficiency of the evidence to sustain a judgment, we are mindful that every controverted fact must be resolved in favor of the successful party, and such party is entitled to the benefit of every inference that can reasonably be deduced from the evidence.[21] Howard testified that in the summer of 2002, he and Palagi, on behalf of Law Offices, reached a specific oral agreement that Howard would receive 25 percent of the fee in three cases, including Jurado and Christiansen, and that based upon this agreement, Howard decided to stay with the firm at that time. While this testimony was disputed by Palagi, we conclude that it was sufficient to warrant submission of Howard's counterclaims based upon breach of an oral agreement.
In a related argument, Law Offices contends that because Howard received a discretionary bonus in the year in which the fee in the Christiansen case was received by Law Offices, which bonus exceeded the amount he claimed was due to him from the Christiansen case, he was not entitled to an additional share of that fee. The record reflects that Howard received a bonus in November 2002 and that Law Offices received the fee in the Christiansen case in December of that year. Howard specifically testified that he did not receive the promised 25 percent of that fee. The jury resolved the disputed factual issue in Howard's favor, and we will not disturb its findings under our deferential standard of review.
We do note one error with respect to the amount awarded to Howard on his counterclaim with respect to the fee in the Jurado case. The $195,000 award represents 25 percent of the total fee of $780,000 being held by the clerk of the Phelps County Court at the time of trial. But, as subsequently determined by the district court for Buffalo County, Law Offices was entitled to $746,250 of the fee in the Jurado case and Howard was entitled to the remainder. Thus, the award of 25 percent of the entire fee to Howard would result, at least to some degree, in an impermissible double recovery.[22] Accordingly, we modify the judgment in favor of Howard on the fee in the Jurado case by reducing it from $195,000 to $186,562.50, which represents 25 percent of that fee awarded to Law Offices by the district court for Buffalo County.

(c) Nebraska Wage Payment and Collection Act
Howard argues that the district court erred in failing to find that the jury's award of 25 percent of the fee in the Jurado case was an award of "wages" under the NWPCA and thus erred in failing to award him costs and attorney fees on the claim.[23] Howard further argues that the district court erred in not ordering Law Offices to pay an additional amount to the common schools fund pursuant to the NWPCA.[24] Law Offices argues that we lack jurisdiction to resolve these issues because of a deficiency in Howard's notice of appeal. We conclude that we have jurisdiction to address the NWPCA issues presented in this appeal.
*15 Under the NWPCA, "[a]n employee having a claim for wages which are not paid within thirty days of the regular payday designated or agreed upon may institute suit for such unpaid wages in the proper court."[25] If the employee has an attorney, the employee "shall be" entitled to recover "an amount for attorney's fees assessed by the court, which fees shall not be less than twenty-five percent of the unpaid wages."[26]
The district court refused to award attorney fees on the amount the jury awarded Howard as his share of the fee in the Jurado case, reasoning that this amount did not qualify as "wages" under the NWPCA. Under the NWPCA, "[w]ages mean compensation for labor or services rendered by an employee ... when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis."[27] A bonus can qualify as wages if the employer and employee agreed to it in advance.[28]
Howard argues on appeal that the jury award of the fee in the Jurado case meets the definition of wages under the statute because it was a bonus agreed to by the parties for which all conditions were met. He contends that it is unreasonable not to treat his claim to 25 percent of that fee as a "bonus" in the same manner as his claim to 25 percent of the fee in the Christiansen case. He further argues that the fact that the money at issue was held by the Phelps County Court is irrelevant because Palagi denied the existence of the 2002 oral agreement, and that thus, even if Law Offices had received the fee in the Jurado case, it would not have paid Howard a 25-percent share.
The oral agreement between Howard and Law Offices with respect to division of the fee in the Jurado case, as described by Howard, had not ripened into a claim for wages at the time of trial. Howard's own testimony indicates that he was not paid his share of the fee in the Barker case until the fee was actually received by Law Offices. His testimony also clearly indicates that he did not expect to receive a share of the fee in the Christiansen case until it was received by Law Offices. In characterizing his successful NWPCA claim on that fee, Howard's brief states that Law Offices received the fee in December 2004 and "failed to pay [him] 25% of the fee within thirty (30) days of said date."[29] As we view the record, Howard had no viable claim to a portion of the fee in the Jurado case until it was received by Law Offices, which has not yet occurred because both parties agreed that it would be held in the Phelps County Court pending resolution of their litigation. The district court did not err in denying Howard's NWPCA claims with respect to the fee in the Jurado case.
Because Howard did receive an award of attorney fees and costs as to his share of the fee in the Christiansen case, we address his argument that the court should have ordered Law Offices to pay an additional amount to the common schools fund. The NWPCA provides that if an employee secures judgment on a wage collection claim, the court may order the employer to pay an amount equal to *16 one or two times the amount of the judgment to the common schools fund.[30] It is within the court's discretion whether to order such a payment.[31] Whether or not the parties had an agreement whereby Howard would receive a percentage of the fee in the Christiansen case was disputed at trial. Although the jury resolved this issue in Howard's favor, we conclude that the district court did not abuse its discretion in declining to order Law Offices to pay an amount to the common schools fund under § 48-1232.

(d) Breach of Fiduciary Duty
In its cross-appeal, Law Offices argues that the district court erred in directing a verdict against Law Offices on its claim that Howard breached a fiduciary duty by communicating with Jurado regarding his decision to leave the firm while still employed by Law Offices. In sustaining Howard's motion, the district court noted that there was no evidence that Howard's conduct was the proximate cause of any damage to Law Offices. As noted, Jurado testified that she would have retained Howard to conclude her case regardless of when she learned that he was leaving Law Offices, and regardless of any efforts by Law Offices to discourage her from doing so.
Relying on a Utah case[32] and this court's inherent authority to regulate lawyers and the practice of law, Law Offices argues that Howard's communication with Jurado in his own behalf while still an employee of Law Offices warrants "two possible remedies: disgorgement of any amounts awarded to Howard from the Jurado case, or reimbursement to the firm of the $247,852.00 that is specifically related to the provisions of the [Attorney's] Agreement relating to post-termination legal fees."[33] In the Utah case, an associate attorney had secretly represented clients and retained fees while employed by a law firm, using the firm's resources to do so. Finding that this conduct breached a fiduciary duty owed to the firm, the court ordered him to disgorge all fees collected from the undisclosed clients while still employed by the firm. The court denied the firm's request for total forfeiture of all compensation paid to the associate during the period when the breach occurred, concluding that the circumstances did not require "such a harsh remedy."[34]
We do not read this case to support Law Offices' apparent contention that causation is not an element of a claim based upon an alleged breach of a fiduciary duty. Indeed, a subsequent decision by a U.S. District Court applied Utah law and specifically discussed evidence of causation in denying summary judgment on a breach of fiduciary duty claim.[35] We note that Howard has not retained fees from his representation of Jurado, and he will receive only those portions of the total fee specifically awarded to him in this case and the action in the district court for Buffalo County. We conclude on the basis of this record that the district court did not err in granting Howard's motion for *17 directed verdict with respect to Law Offices' claim of breach of fiduciary duty,

(e) Remaining Assignments of Error
An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[36] In light of our determinations that Law Offices is not entitled to recover on its breach of contract and breach of fiduciary claims and that Howard is to retain his judgment on the counterclaims, as modified, it is unnecessary for us to reach the remaining assignments of error.

IV CASE NO. S-06-384
This is an appeal by Law Offices from the dismissal of the second action which it filed against Howard in the district court for Douglas County. It sought to enforce the provision of the Attorney's Agreement which required Howard to assign fees received from former clients of the firm if he performed services for such clients, at their request, after he left the firm. The district court sustained Howard's motion to dismiss, reasoning that the case involved the same parties and the same issues presented in the previously filed action. Law Offices does not dispute this, and concedes in its brief that "it could well be argued that Law Offices has not been prejudiced by the court's dismissal."[37] But it argues that the dismissal with prejudice "might be construed as limiting Law Offices' remedies down the road."[38]
Without speculating as to the nature of such remedies or the length of the road, we conclude that the district court did not err in dismissing this action. In general, the law does not favor piecemeal litigation of disputes.[39] In this action, Law Offices sought to enforce the same contractual restrictions on Howard's right to retain fees after leaving the firm that were at issue in the previously filed action which was tried to conclusion. We have found those restrictions to be contrary to public policy and unenforceable in our disposition of case No. S-06-664. We affirm the order of dismissal in this case.

V. CONCLUSION
For the reasons discussed, the appeal in case No. S-07-757 is dismissed for lack of appellate jurisdiction. Upon issuance of our mandate, the final order of the district court will require the clerk of the Phelps County Court to disburse the $780,000 fee in the Jurado case which has been held in an interest-bearing account pursuant to the stipulation of the parties. Of this amount, Law Offices will receive $746,250 plus 95.68 percent of the accrued interest, and Howard will receive $33,750 plus 4.32 percent of the accrued interest.
In case No. S-06-664, we reverse and vacate the judgment in favor of Law Offices, based upon our determination that the contractual restrictions which it sought to place upon Howard's practice of law after leaving the firm are contrary to public policy and unenforceable. As to Howard's counterclaim seeking 25 percent of the fee in the Jurado case paid to Law Offices, we reduce the amount from $195,000 to $186,562.50 in order to prevent a double recovery and affirm as modified. As to Howard's counterclaim seeking 25 *18 percent of the fee in the Christiansen case paid to Law Offices, we affirm the judgment of $16,625 and the award of $4,156.25 in costs and attorney fees under the NWPCA.
Finally, in case No. S-06-384, we affirm the judgment of dismissal entered by the district court.
JUDGMENT IN NO. S-06-384 AFFIRMED.
JUDGMENT IN NO. S-06-664 REVERSED AND VACATED IN PART, AND IN PART AFFIRMED AS MODIFIED.
APPEAL IN NO. S-07-757 DISMISSED.
NOTES
[1] Jurado v. Agri Co-op, 12 Neb.App. xxvi (No. A-02-1207, June 4, 2004).
[2] Neb.Rev.Stat. § 7-108 (Reissue 1997).
[3] Neb.Rev.Stat. §§ 48-1228 to 48-1232 (Reissue 1998).
[4] Goodman v. City of Omaha, 274 Neb. 539, 742 N.W.2d 26 (2007); Williams v. Baird, 273 Neb. 977, 735 N.W.2d 383 (2007).
[5] See, Williams v. Baird, supra note 4; Cerny v. Todco Barricade Co., 273 Neb. 800, 733 N.W.2d 877 (2007).
[6] Neb.Rev.Stat. § 25-1329 (Cum. Supp. 2006).
[7] Neb.Rev.Stat. § 25-1912(3) (Cum. Supp. 2006); Strong v. Omaha Constr. Indus. Pension Plan, 270 Neb. 1, 701 N.W.2d 320 (2005).
[8] Interstate Printing Co. v. Department of Revenue, 236 Neb. 110, 114, 459 N.W.2d 519, 523 (1990), quoting In re Marriage of Mullinax and Mullinax, 292 Or. 416, 639 P.2d 628 (1982).
[9] Id. at 113, 459 N.W.2d at 522-23, quoting Gunia v. Morton, 175 Neb. 53, 120 N.W.2d 371 (1963).
[10] American Fam. Mut. Ins. Co. v. Hadley, 264 Neb. 435, 648 N.W.2d 769 (2002); Ploen v. Union Ins. Co., 253 Neb. 867, 573 N.W.2d 436. 253 Neb. 867, 573 N.W.2d 436 (1998).
[11] In re Trust Created by Isvik, 274 Neb. 525, 741 N.W.2d 638 (2007); Domjan v. Faith Regional Health Servs., 273 Neb. 877, 735 N.W.2d 355 (2007).
[12] Karel v. Nebraska Health Svs., 274 Neb. 175, 738 N.W.2d 831 (2007); Green Tree Fin. Servicing v. Sutton, 264 Neb. 533, 650 N.W.2d 228 (2002).
[13] Neb. Ct. R. of Prof. Cond., preamble, ¶ 16 (rev. 2005); Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 607 A.2d 142 (1992).
[14] Neb. Ct. R. of Prof. Cond. 5.6 (rev. 2005).
[15] 15 Grace McLane Giesel, Corbin on Contracts § 80.22 at 166 (Joseph M. Perillo ed., rev. ed. 2003). See, also, 6 Samuel Williston, A Treatise on the Law of Contracts § 13:7 (Richard A. Lord ed., 4th ed. 1995) (citing cases).
[16] See, e.g., Jacob v. Norris, McLaughlin & Marcus, supra note 13.
[17] Id.
[18] Jacob v. Norris, McLaughlin & Marcus, supra note 13, 128 N.J. at 18, 607 A.2d at 146, quoting ABA Comm. on Ethics and Prof. Responsibility, Formal Op. 300 (1961).
[19] See, Jacob v. Norris, McLaughlin & Marcus, supra note 13; Spiegel v. Thomas, Mann & Smith, P.C., 811 S.W.2d 528 (Tenn.1991); Anderson v. Aspelmeier, Fisch, Power, 461 N.W.2d 598 (Iowa 1990); Cohen v. Lord, Day & Lord, 75 N.Y.2d 95, 550 N.E.2d 410, 551 N.Y.S.2d 157 (1989); Hagen v. O'Connell, Goyak & Ball, 68 Or. App. 700, 683 P.2d 563 (1984).
[20] Id.
[21] Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007).
[22] See Olivotto v. DeMarco Bros. Co., 273 Neb. 672, 732 N.W.2d 354 (2007).
[23] See § 48-1231.
[24] See § 48-1232.
[25] § 48-1231.
[26] Id.
[27] § 48-1229(4).
[28] See Knutson v. Snyder Industries, Inc., 231 Neb. 374, 436 N.W.2d 496 (1989).
[29] Brief for appellant in case No. S-06-664 at 31 (emphasis supplied).
[30] § 48-1232.
[31] Morris v. Rochester Midland Corp., 259 Neb. 870, 612 N.W.2d 921 (2000).
[32] Prince, Yeates & Geldzahler v. Young, 94 P.3d 179 (Utah 2004).
[33] Brief for appellee on cross-appeal in case No. S-06-664 at 10.
[34] Prince, Yeates & Geldzahler v. Young, supra note 32, 94 P.3d at 185.
[35] Farm Bureau Life Ins. v. American Nat. Ins. Co., 505 F.Supp.2d 1178 (D.Utah 2007), citing Prince, Yeates & Geldzahler v. Young, supra note 32.
[36] In re Trust Created by Hansen, 274 Neb. 199, 739 N.W.2d 170 (2007).
[37] Brief for appellee on cross-appeal in case No. S-06-664 at 13.
[38] Id.
[39] See, e.g., Smith v. Lincoln Meadows Homeowners Assn., 267 Neb. 849, 678 N.W.2d 726 (2004); J.B. Contracting Servs. v. Universal Surety Co., 261 Neb. 586, 624 N.W.2d 13 (2001).